# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 98-30463

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

GREGORY DEAN BROWN,

Defendant-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

———————

No. 98-30584

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

LEONARD STEVEN STEVE GRAVES,

Defendant-Appellant.

———————————

Appeals from the United States District Court
for the Western District of Louisiana

———————————

August 24, 1999

Before SMITH, WIENER, and
    BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this consolidated appeal, Leonard Graves appeals his money laundering convictions, a number of his fraud convictions, and his sentence. Gregory Brown appeals his sentence. We affirm Graves's fraud convictions, reverse his money laundering convictions, and vacate and remand his sentence. We affirm Brown's sentence.

## I.

The fraud and money laundering charges of

which Graves was convicted, and Brown's wire fraud conviction, relate to business dealings conducted at Steve Graves Chevrolet-Pontiac-Cadillac, Inc. ("SGC"), an auto dealership in Ruston, Louisiana. Graves was the dealer, president, and 41% owner of SGC, and Brown managed its body shop.

The 120-count indictment against Graves alleged six distinct types of fraud,[1] and for each fraud allegation there was a corresponding money laundering charge. Graves was convicted on counts stemming from three of the six types of fraud and was convicted of money laundering the funds derived from these frauds. Brown pleaded guilty to a type of fraud of which Graves was not convicted.

The first type of fraud involved SGC's charging car buyers more than the amount authorized by state law for document and license/title fees. SGC charged purchasers $59 in document fees, which is $9 more than Louisiana law permits; automobile dealerships are allowed to charge only $35 for processing paperwork and $15 for a notary fee. *See* LA. R.S. 6:956(E)(1), (2). For the license and title fees, which varied from vehicle to vehicle, SGC overcharged an average of $50 per automobile listed in the indictment.[2] The

eighteen instances of overcharging were charged against Graves as mail frauds, because the Louisiana Department of Motor Vehicles mailed the automobile titles. Graves was also charged with money laundering the proceeds of the excessive fees. The jury found Graves guilty on some of the counts and not guilty on others.

Graves was convicted of fraud based on SGC's financing the purchases of used cars with "cash for gas." In seven instances, SGC advanced to the purchaser all or part of the down payment required by the financing institutionSSunder the guise of giving the buyer some "cash for gas"SSand increased the purchase price of the car by a corresponding amount. This conduct constituted fraud, because the lending institution would not have extended credit to the purchaser absent his having some genuine equity interest in the automobile. The counts of which Graves was convicted were charged as mail frauds, because SGC mailed loan documentation to General Motors Acceptance Corporation ("GMAC"), the financing institution.[3] The jury also found Graves guilty of money laundering the funds derived from cash for gas frauds.

The final form of fraud of which Graves was convicted also involved the financing of used cars. For ten cars financed by Union Federal Credit Union, SGC, on behalf of the buyer, forwarded to the credit union 25% of

---

[1] In addition to the four types of fraud discussed below, the indictment alleged that Graves, through SGC, engaged in "parts-to-labor" fraud and "scooping rebates" fraud. The former type of fraud involved SGC's billing automobile insurance companies for new parts but then performing repairs using used parts and falsely charging the price difference as labor. The "scooping rebates" allegations involved SGC's fraudulently denying the benefits of rebates to customers and instead collecting the rebates for the dealership. Graves was acquitted of all charges relating to parts-to-labor and scooping rebates frauds, but the district court found that such frauds had been established by a preponderance of the evidence and considered them in sentencing Graves.

[2] The state charged $18.50 for the title, (continued...)

(...continued)
$5.50 for handling, $5.00 to record a lien or mortgage, and an amount specifically for the license that varied, according to a Department of Motor Vehicles table, with the selling price of the vehicle. The total was the "license fee." SGC typically collected $102 per vehicle as the license fee. This resulted in an average overcharge of $50 per automobile listed in the indictment.

[3] One instance of "cash for gas" was charged as bank fraud, for the lender in that instance was a bank. The jury acquitted Graves of that charge and the corresponding money laundering count.

the sale price, which the credit union maintained in a savings account in the purchaser's name until the loan was paid off. The dealership increased the sale price of the vehicle by a corresponding amount. As with "cash for gas," this scheme had the effect of fraudulently inducing advances of credit, for the credit union believed that the 25% down payment represented genuine purchaser equity in the purchased automobiles. These counts were charged as bank frauds, and the jury returned a guilty verdict. It also found Graves guilty of money laundering the proceeds derived from the bank frauds. Graves does not appeal these bank fraud convictions, but he does appeal the corresponding money laundering convictions.

The government charged Brown and Graves with filing fraudulent warranty claims. The indictment alleged ten instances in which SGC recovered warranty money from General Motors for repairs to vehicles when, in fact, the repaired vehicles were not covered by warranties. The government charged the fraudulent warranties as wire frauds, because General Motors credited the cost of repairs via computer. The jury found Graves not guilty of the wire fraud and corresponding money laundering charges. Brown, however, pleaded guilty to one count of wire fraud based on submission of a fraudulent warranty claim.

In sentencing Graves, the court declined to group his fraud and money laundering convictions. Instead, it sentenced him solely on the basis of his money laundering offenses, which carry a tougher penalty than do fraud offenses. *Compare* U.S.S.G. § 2F1.1 (imposing a base offense level of six for mail and wire fraud) *with* U.S.S.G. § 2S1.1 (imposing a base offense level of 23 for money laundering). With an adjusted offense level of 30 and a criminal history category of I, the guidelines range was 97 to 121 months. The court departed downward by only one month, sentencing Graves to 96 months' incarceration. The court based the downward departure on its conclusion that Graves's conduct was outside the heartland of money laundering.

Based on Brown's plea of guilty to a charge of wire fraud, he was sentenced to an eighteen-month term of imprisonment and restitution of $75,104.18.[4] The court increased Brown's offense level by six to account for a fraud loss greater than $70,000 but no more than $120,000. *See* U.S.S.G. § 2F1.1(b)(1)(G). After Brown's sentencing, the court granted the government's "Motion to Correct Judgment and Commitment Order" asking the court to lower Brown's required restitution to victim insurance companies and individuals to $67,938.72. Brown contends that this "lower loss figure" calls for an increase of his base offense level of only five, not six, levels and that his sentence is thus unduly severe.

---

[4] Brown was also given a three-year term of supervised release, which is to begin following his release from prison, and he was ordered to pay an assessment to the crime victim fund.

Graves appeals his convictions on fraud counts stemming from excessive document and license/title fees and "cash for gas" frauds. He also appeals all his money laundering convictions and his sentence. Brown appeals only his sentence, asserting that it should be reduced to reflect an error of fact discovered subsequent to sentencing.

## II.

We first consider Graves's claim that there was insufficient evidence to support a number of his convictions. In evaluating a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and uphold the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt. *United States v. Giraldi*, 86 F.3d 1368, 1371 (5th Cir. 1996). Our review is *de novo*. *United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir. 1993). We consider "the countervailing evidence as well as the evidence that supports the verdict" in assessing sufficiency of the evidence. *Giraldi*, 86 F.3d at 1371. If "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," a defendant is entitled to a judgment of acquittal. *United States v. Schuchmann*, 84 F.3d 752, 754 (5th Cir. 1996).

The evidence is sufficient to sustain Graves's convictions of fraud stemming from excessive fees and "cash for gas." There is, however, insufficient evidence to sustain his money laundering convictions.

## A.

The alleged offenses involving Graves's charging excessive document and license/title fees were charged as mail fraud, a violation of 18 U.S.C. § 1341. The government must prove beyond a reasonable doubt "(1) the existence of a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent on the part of the defendant[] to commit fraud." *United States v. Salvatore*, 110 F.3d 1131, 1136 (5th Cir.), *cert. denied*, 118 S. Ct. 441 (1997). Graves does not contest the sufficiency of the evidence on the

first two elements but contends that there was insufficient evidence to support a finding that he specifically intended to commit fraud. There was no specific intent, he argues, because he did not know of the overcharges. The jury, properly instructed,[5] concluded otherwise, and there was sufficient evidence to support its conclusion.

### 1.

SGC overcharged $9 per vehicle for document fees ($59 rather than the maximum $50). Graves asserts that the government presented no evidence that he knew of this overcharge; the evidence showed, he says, that he corrected the $9 overcharge as soon as he learned from a Louisiana Automobile Dealers Association newsletter that the $59 charge was too high.

To maintain his claim of insufficient evidence, Graves must discount the testimony of Jim Smith, who had managed SGC's Finance and Insurance Office for a number of months during the indictment period. Smith testified that the document fee was too high and that he had discussed that fact with Graves before Graves's discovery of the article indicating that the fee was too high. Graves asserts that the jury could not rationally have credited Smith's testimony over his own.

---

[5] In accordance with Fifth Circuit Pattern Jury Instructions 1.37, the jurors were instructed as follows:

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

According to Graves, Smith, who was fired for inadequacies in his paperwork, obviously did not know what he was talking about, because he testified counterfactually that the dealership charged $80-100 as a document fee. When the government tried to conform his testimony to the uniformly charged $59 fee, the court sustained Graves's attorney's objection to "leading."

Despite Graves's protests, Smith's testimony provided a sufficient evidentiary basis for the jury's conclusion that Graves knew of the document fee overcharge. While Smith's testimony may not have been the most compelling, the jury was not irrational in crediting it over Graves's. It is certainly possible that Smith, who was finance manager for only four months, could have forgotten the exact figure charged as a document fee but remembered that the fee charged was too high and that he had discussed that fact with Graves. The jury chose to believe Smith, and its choice was not irrational.[6]

2.

Graves contends that the evidence does not support a conclusion beyond a reasonable doubt that he intended to overcharge license and title fees. He admits that the evidence would support a conclusion that he knew as of July 1994 that such overcharges were occurring, for there was evidence that Teresa Shelton, Graves's office manager, told him at that time that SGC was charging too high a fee.[7] Graves notes, however, that the evidence shows that he immediately ordered Newton, his financial and insurance manager at the time, to stop the overcharging. There is no

evidence, he asserts, that he knew that Newton was failing to follow this order.

This assertion is simply incorrect. At least three pieces of evidence support a conclusion that Graves knew the overcharges were continuing. First, Shelton testified that she told Graves that Newton was continuing to overcharge. In addition, general manager Richard Anderson testified that he discussed the excessive license fees with Graves on several occasions and that Graves had told him that sometimes SGC overcharged and sometimes undercharged, and things would balance out in the end.[8] Finally, Graves admits that on the occasions Shelton reported Newton's mistakes to Graves, he did not ask her to provide refunds to the overcharged customers.

This evidence, viewed in the light most favorable to the verdict, adequately supports a finding that Graves knew of the license/title fee overcharges. The jury thus rationally could

---

[6] *See United States v. Guerrero*, 169 F.3d 933, 939 (5th Cir. 1999) (holding that on review of sufficiency of evidence to convict, court of appeals must accept credibility choices that support the verdict, and court may not reweigh evidence).

[7] Indeed, the jury must have determined that Graves did not know of the overcharges before July 1994, because it acquitted him of those counts of mail fraud occurring before that date.

[8] Graves unsuccessfully attempts to downplay this testimony. He asserts that Anderson's testimony is unconvincing because (1) the government offered no evidence as to the date of the remark, which might have occurred before July 1994, when Shelton first found out that license/title fee overcharges were occurring; (2) Shelton, who regularly attended the managers' meetings, never heard such a remark; and (3) Anderson lost all credibility when he portrayed NewtonSSthe very person who refused to adhere to Graves's order to lower the feeSSas complaining *to* Graves that the fee was too high.

None of these reasons requires discrediting Anderson's testimony. First, the jury could reasonably have concluded that Graves's alleged remark to Anderson occurred after he learned that overcharging was occurring, for the very subject matter of the remark was the dealership's overcharging. Second, the fact that Shelton did not hear the remark does not prove that it never occurred; the remark might have occurred outside her presence, or she might not have been paying attention. Finally, the argument about Anderson's credibility should not persuade us to reverse a verdict, for credibility determinations are for the jury. *See Guerrero*, 169 F.3d at 939.

have concluded that Graves, knowing of the overcharges and refusing to take effective steps to stop them or remedy them through refunds, intended the frauds. Accordingly, we affirm Graves's fraud convictions stemming from SGC's overcharges of document and license/title fees.[9]

## B.

Graves argues that the evidence supporting his "cash for gas" fraud convictions is insufficient, because there is no evidence that he continued to approve of cash for gas financing after he learned that GMAC disapproved of it. Cash for gas financing, he asserts, is not obviously fraudulent. Accordingly, the government could not have established Graves's criminal liability unless it proved that he knew he was doing something wrong by offering cash for gas; such proof was necessary to establish the third prong of mail fraudSS*i.e.*, that he specifically intended to commit fraud. *See Salvatore*, 110 F.3d at 1136.

Graves admits that the government did

---

[9] Graves points to one other piece of evidence that, he says, shows that the verdict is unsound. He notes that every employee of SGC who bought a car at the dealershipSSincluding Shelton, who was the centerpiece of the government's effort to prove that Graves violated the law intentionallySSpaid the overcharge well after Graves ordered Newton to discontinue it. Graves asserts that Shelton, who, on the government's evidence, knew better, would not have allowed herself to be overcharged, and the fact that she did accept an overcharge indicates that she (and thus Graves, as Shelton was allegedly the source of his knowledge) did not know that the license fee was still being overcharged.

This argument is unpersuasive. A rational jury could have concluded that Shelton allowed herself to be overcharged so as not to draw attention to the practice, or perhaps because she had gotten a good deal from the dealership and did not want to be too demanding about small fees. Her willingness to pay the overcharge does not compel the conclusion that she (and thus Graves) did not know of the overcharge.

offer proof that he eventually knew cash for gas was improper. It provided testimony from Dave Jeffers, a GMAC official who told Graves that "in our [GMAC's] judgment, [cash for gas] is a misrepresentation of the contract." Graves further admits that if the government had proven that cash for gas transactions occurred with Graves's knowledge after this notification, then a rational jury could have found him guilty of fraud. That was, in fact, the government's theory of fraud; it explained in summation that "after GMAC said to stop it," "to submit the paperwork knowing it was fraudulent, was fraud."

Graves's argument is that there was no evidence that he approved cash for gas transactions after he learned that such financing was unacceptable to GMAC. The government never proved the date of Jeffers's admonition about the impropriety of cash for gas, and the jury, Graves argues, thus could not have found beyond a reasonable doubt that any of the transactions occurred after Graves had knowledge that they were fraudulent.

Despite the absence of evidence that Jeffers's statement pre-dated the cash for gas transactions, a rational juror could have concluded that Graves knew the charged cash for gas deals involved material misrepresentations and were thus fraudulent. A rational jury could assume that any astute businessman would know that (1) a financing institution that requires a down payment before extending credit is attempting to ensure that the debtor has an equity interest in the purchased good and will thus be "hurt" in some way if the good is repossessed, and (2) the financing institution would be less likely to extend credit if the down payment was really a "loan" from another entity (in this case, from the dealership).

The jury may thus have simply disbelieved Graves's claim that he did not know cash for gas was dishonest. Indeed, Graves gave the jury a reason to doubt his candor toward GMAC with respect to the cash for gas transactions; he admits that even after he learned from Jeffers that cash for gas was fraudulent, general manager Anderson

6

continued to conduct such transactions, and when Graves learned that Anderson had done so, Graves neither undid the deals nor advised GMAC of what Anderson had done. Thus, there was direct evidence that Graves, knowing a loan had been fraudulently induced, withheld material information.

Given that (1) any astute businessman would know cash for gas was wrong, and (2) the evidence showed Graves's dishonesty and lack of candor on particular cash-for-gas transactions that he undoubtedly knew to be fraudulent, the jury could have rationally concluded, beyond a reasonable doubt, that Graves knew cash for gas financing was generally fraudulent. Hence, we affirm his fraud convictions on counts stemming from cash-for-gas financing.

### C.

Each money laundering count on which Graves was indicted was charged under 18 U.S.C. § 1956(a)(1)(A)(i), which reads, in part:

(A) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity

(i) with the intent to promote the carrying on of specified unlawful activity; . . . .[10]

To obtain a conviction under § 1956(a)(1)(A)(i), the government must prove beyond a reasonable doubt "[t]hat the defendant (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, (3) with the intent to promote or further unlawful activity." *United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994) (citations and internal quotations omitted). Graves asserts that there was insufficient evidence to establish that the charged money laundering transactions were intended to promote any fraud committed at SGC.[11] We agree.

The transactions the indictment charged as money laundering consisted of expenditures, paid by checks written by SGC, that allegedly promoted the fraud.[12] Graves contends that

---

[10] Subsequently, the money laundering statute defines "specified unlawful activity" to include mail and wire fraud. *See* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

[11] The money laundering statute proscribes, in separate provisions, "promotion" and "concealment" transactions. All the money laundering counts against Graves charged him with violating § 1956(a)(1)(A)(i), which proscribes the use of criminally derived funds "with the intent to promote" specified unlawful activities. Graves was not charged with undertaking transactions aimed at "concealing" criminally derived funds, which is a violation of § 1956(a)(1)(B).

[12] The government, in selecting financial transactions to fulfill the *actus reus* requirement of the money laundering charges, picked benign business expendituresSSpurchases of goods and services necessary to maintain SGC's legitimate business operations. It did not have to do so. Courts have held that a promotion money laundering offense
(continued...)

there was no evidence that the payment of those checks was intended to promote any fraud at SGC; the checks were simply legitimate business expenses of the dealership. Indeed, a review of the checks indicates that they were for "above board" expenses.[13]

Graves argues that such expenditures are not the sort of crime-promoting transactions criminalized by § 1956(a)(1)(A)(i), for the promotion element requires some identifiable and affirmative advancement of the specified criminal activity. In support of this claim, he points to a number of cases involving "promotion" money laundering in which the court highlighted how the expenditures explicitly furthered specified unlawful activity.[14] He then contrasts those cases to the case at hand, in which the nexus between the charged expenditures and any fraud activity is non-existent or weak.

Graves also points to *United States v. Jackson*, 935 F.2d 832 (7th Cir. 1991), in which the defendant, who was both a preacher and drug dealer, deposited drug proceeds into his church's checking account. From the church account, he wrote checks to pay for beepers, mobile phones, and rent; he also wrote some checks for cash. *See id.* at 841. The defendant's drug runners used the beepers to communicate with each other, and the court therefore held that the beeper purchases were intended to promote the specified unlawful conduct. *Id.* The checks for mobile phones, rent, and cash, however, did not promote the criminal activity and thus did not constitute money laundering. *Id.* The court explained:

---

(...continued)
may occur when a defendant receives and deposits criminally derived funds, in which case the *deposit* of the funds is the transaction intended to promote the specified unlawful activity. *See, e.g., United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991). But the government chose not to indict Graves for depositing the proceeds of fraud. Instead, it made a strategic decision to focus on SGC's spending transactions (*i.e.*, the checks the dealership wrote), not on SGC's depositing of funds, perhaps because "receipt and deposit" money laundering prosecutions are disfavored.

Such prosecutions have been criticized because the harm of the money laundering transaction (*i.e.*, the deposit) is not significantly greater than that of the underlying offense. *See* REPORT FOR THE SENATE AND HOUSE JUDICIARY COMMITTEE ON THE CHARGING AND PLEA PRACTICES OF FEDERAL PROSECUTORS WITH RESPECT TO THE OFFENSE OF MONEY LAUNDERING 8-9 (1996) (report issued by the Department of Justice pursuant to Pub. L. 104-38, 109 Stat. 334 (1995)). Indeed, the Department of Justice issued a Blue Sheet to chapter 9-105.000 of the U.S. Attorney's Manual requiring consultation by a U.S. Attorney's Office with the Department before a receipt and deposit case may be prosecuted. *Id.* at 13-14. *See also United States v. Woods*, 159 F.3d 1132, 1135 (8th Cir. 1998) (quoting 1996 DOJ Report to the effect that money laundering statutes "should not be used in cases where the money laundering activity is minimal or incidental to the underlying crime . . ."). Having chosen to prosecute Graves for spending (not merely depositing) dirty money, the government was required to show that the expenditures were conducted with an "intent to promote" SGC's fraudulent activity.

[13] The allegedly laundered funds paid for (1) parts, paints, and materials; (2) the floor plan, cars that had been traded in, floor plan interest, and a charge back; (3) software support and office supplies; (4) conversions; (5) used cars; (6) disposal of waste oil and used oil filters; (continued...)

---

(...continued)
(7) t-shirts, caps, coffee mugs; (8) yearbook advertisements; (9) a computer system lease; (10) advertising representation; (11) Graves's travel expenses; (12) extended warranties on used automobiles; (13) glass replacement; (14) automobile association membership fees; (15) photocopier supplies; and (16) a health plan.

[14] *See, e.g., United States v. Nattier*, 127 F.3d 655 (8th Cir. 1997), *cert. denied*, 523 U.S. 1065 (1998) (checks paid for real estate that promoted the specified embezzlement scheme); *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992) (checks paid for office where defendant conducted the fraud and luxury car that defendant used to impress investors); *United States v. Hildebrand*, 152 F.3d 756, 762-63 (8th Cir.) (in solicitation fraud, checks used to pay solicitors), *cert. denied*, 119 S. Ct. 575 (1998).

The government did not prove that the cellular phones played the same roleSSor indeed any roleSSin Davis' drug operations as the beepers. Likewise the rental payments and the checks written to cash; certainly these expenditures maintained Davis' lifestyle, but more than this is needed to establish that they promoted his drug activities.

*Id.*

Graves argues that the expenditures charged in the money laundering counts of the indictment are analogous to the *Jackson* defendant's expenditures on mobile phones and rent: They were intended to support the dealership's legitimate business activities and evince no intent to promote fraud.

The government insists that the expenditures did promote fraud. Its theory, which the district court accepted, is that the transactions charged in the indictment promoted the ongoing and future criminal activity at SGC, despite the fact that they were expenditures on the basic operations of the car dealership, because the operation of the dealership was one grand scheme to defraud. In other words, any legitimate operating expense that permitted SGC to stay in business and maintain or increase its customer base would also be an expenditure intended to promote fraud, because it would ensure a steady supply of potential victims.

The charged transactions, the government asserts, are akin to those in *United States v. Coscarelli*, 105 F.3d 984 (5th Cir.), *vacated*, 111 F.3d 376 (5th Cir. 1997), *reinstated*, 149 F.3d 342 (5th Cir. 1998), a case involving telemarketing fraud. There, the defendant used the proceeds of his illegal activity to pay his co-conspirators and the operating expenses of their scheme. *Id.* at 990. The government maintains that the instant case is similar; Graves used the funds from the fraud at SGC to pay SGC's operating expenses, enabling the dealership to defraud more customers. The government also relies on *United States v. Leonard*, 61 F.3d 1181, 1186 (5th Cir. 1995), in which the defendant telemarketer used his

ill-gotten gains to pay his callers, purchase leads, and pay telephone bills so he could scam more people.[15]

Despite the government's creative argument, we agree with Graves that there is insufficient evidence that the charged expenditures were financial transactions conducted "with the intent to promote the carrying on of specified unlawful activity." The problem with the government's position is that it ignores the *intent* aspect of the promotion element. Section 1956(a)(1)(A)(i) is not satisfied by a showing that a financial transaction involving the proceeds of specified unlawful activity merely promoted the carrying on of unlawful activity. The provision has a specific intent element: The government must show that the "dirty money" transaction was conducted "*with the intent* to promote the carrying on of specified unlawful activity."

This element is not satisfied by mere evidence of promotion, or even knowing promotion, but requires evidence of *intentional* promotion. By contrast, § 1956(a)(1)(B), the money laundering provision applicable to "concealment" transactions, requires only knowing concealment, indicating that Congress intended a stringent *mens rea* requirement for promotion money laundering. Thus, absent some evidence that a dirty money transaction that in fact promoted specified unlawful activity was conducted *with the intent* to promote such activity, a defendant

---

[15] The government also argues that Graves's reliance on *Jackson* is misplaced. It maintains that *Jackson* is distinguishable because the legitimate expenditures found not to have been conducted with the intent to promote unlawful activity were personal expenditures. Here, by contrast, the charged expenditures were not for personal items. The government's only support for this "personal versus non-personal" distinction is the *Cavalier* court's offhand observation that *Jackson* was "a case of a person simply using illegally obtained funds to purchase personal items." *See* 17 F.3d at 93. The *Cavalier* court did not establish a principle that all "non-personal" expenditures made with dirty money fall within the ambit of § 1956(a)(1)(A)(i).

9

may not be convicted of promotion money laundering under § 1956(a)(1)(A)(i).

This does not mean that there must always be direct evidence, such as a statement by the defendant, of an intent to promote specified unlawful activity. In many cases, the intent to promote criminal activity may be inferred from the particular type of transaction. For example, an intent to promote drug trafficking activities could be inferred from the *Jackson* defendant's purchase of beepers, because beepers were not necessary to the defendant's legitimate business operations and played an important role in his drug trafficking scheme.

In the case at hand, had the government produced evidence of, say, payments for postage for mailing fraudulent warranty claims, such payments might have provided evidence of an intent to promote fraud. Mere evidence of legitimate business expenditures that were necessary to support SGC's non-fraudulent operations, however, was not enough to establish an intent to promote fraud at SGC, even though the expenditures may in fact have promoted SGC's fraudulent activities by increasing the number of potential fraud victims.

We have previously stressed the importance of not turning the "money laundering statute into a 'money spending statute.'" *See Leonard*, 61 F.3d 1181, 1185 n.2 (quoting *United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991)). Strictly adhering to the specific intent requirement of the promotion element of § 1956(a)(1)(A)(i) helps ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability any time a defendant makes benign expenditures with funds derived from unlawful acts.

In a separate money laundering statute, 18 U.S.C. § 1957(a), Congress did criminalize the mere spending of "criminally derived property that is of a value greater than $10,000" with knowledge of the unlawful

source.[16] The fact that Congress established a $10,000 per transaction threshold for convictions for simply spending dirty money further supports our decision to read § 1956(a)(1)(A)(i) to require either direct proof that the charged transaction was intended to promote specified unlawful activity or proof of a type of transaction (such as the *Jackson* defendant's purchase of beepers) that, on its face, indicates an intent to promote such activity.

Absent such proof, § 1956(a)(1)(A)(i) does not permit conviction of a defendant who, like Graves, deposits proceeds of some relatively minor fraudulent transactions into the operating account of an otherwise legitimate business enterprise and then writes checks out of that account for general business purposes. Accordingly, we reverse Graves's money laundering convictions.

### D.

Because the court determined Graves's sentence according to the sentencing guidelines applicable to money laundering (not fraud) offenses, our reversal of his money laundering convictions requires that he be resentenced. We therefore vacate his sentence and remand for resentencing under the guidelines applicable to fraud offenses.

### III.

Brown pleaded guilty to wire fraud stemming from a fraudulent warranty claim. In sentencing Brown, the court increased his offense level by six, pursuant to U.S.S.G. § 2F1.1(b)(1)(C), to account for a fraud loss greater than $70,000 but less than $120,000; the court determined that the loss totaled $75,104.18. Brown was sentenced to eighteen months' imprisonment and ordered to make restitution totaling $75,104.18.

---

[16] *See* D. Randall Johnson, *The Criminally Derived Property Statute: Constitutional and Interpretive Issues Raised by 18 U.S.C. § 1957*, 34 WM. & MARY L. REV. 1291, 1302 (1993) (discussing *Sanders* and noting that "[u]nlike section 1956, section 1957 is indeed a 'money spending statute' . . . .").

After the sentencing, the government filed a "Motion to Correct Judgment and Commitment Order" that advised the court that the "figure ordered for restitution to the victim insurance companies and the individuals is incorrect. The correct amount is lower, $67,938.72." The district court granted the motion. Brown argues that lowering the amount of restitution owed the defrauded insurance companies and individuals moves him out of the $70,000 to $120,000 bracket of U.S.S.G. § 2F1.1(b)(1) and into the $40,000 to $70,000 bracket, for which only a five level increase is required.

Brown's argument is meritless. The $75,104.18 loss the district court found attributable to his conduct included two components: loss to insurance companies and individuals, which totaled $69,548.43, and loss to General Motors Corporation, which totaled $5,555.75. The amendment to Brown's judgment affected only the amount he owed in restitution to "20 victim insurance companies and 15 individuals." There was no adjustment to the amount due General Motors as restitution. Summing the lower figure, $67,938.72, and the amount owed General Motors, $5,555.75, yields a total restitution of $73,494.47SSa sum that still warrants a six-level increase under § 2F1.1(b)(1). Accordingly, the sentence is correct, despite the amended amount of restitution.

For the foregoing reasons, Graves's fraud convictions are AFFIRMED, and his money laundering convictions are REVERSED. Graves's sentence is VACATED and REMANDED for resentencing according to the sentencing guidelines applicable to fraud offenses. Brown's sentence is AFFIRMED.