WELCH, J.,
dissents.
14 respectfully disagree with the majority herein. The majority has construed La. R.S. 14:230(B)(2) in a manner that is inconsistent with the plain wording of that statute and usurped the Louisiana Legislature’s sole constitutional authority to define conduct as criminal and provide penalties for such conduct. See La. Const, art. 3, § 1. After reviewing the evidence in the light most favorable to the prosecution, a rational trier of. fact could conclude the state proved all of the essential elements of the crime of money laundering beyond a reasonable doubt.
The indictment read to the jury and the trial court’s instructions to the jury were that “Defendant, Martin G. Lemoine, has been charged with money laundering, violating Revised Statute 14:230, subpara-graph B-2. During the period of January 20, 1998 through March 6, 1998, by knowingly giving, selling, transferring, maintaining an interest in or otherwise making available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity.” Interestingly, La. R.S. 14:230 also prohibits trading, investing, concealing or transporting anything of value known to be for the purpose of committing or furthering the commission of criminal activity; however, it is crucial to note that the defendant was not charged with these acts.
Accordingly, in order .to convict Lem-oine, the jury had to find that he knowingly gave, sold, transferred, maintained an interest in or made available, anything of value from January 20, 1998 to March 6, 1998, and that he acted for the purpose of engaging in “criminal activity.” Cheney C. Joseph, Jr. & P. Raymond Lamonica, § 10:228 -at 586 in 17 Louisiana Civil Law Treatise (2012). |2The term “criminal activity” is defined by La. R.S. 14:230(A)(1) as “any offense, including conspiracy and attempt to commit the offense that is classified as a felony under the laws of this state or the United States, or that is punishable by confinement for more than one year and the laws of another state.” Additionally and ■ pursuant to La. R.S. 14:230(E), in order to convict Lemoine, the jury also had to place “a value o[n] the funds” to determine the grade of the of *50 fense. In Louisiana Civil Law Treatise: Criminal Jury Instructions and Procedures, the authors note that the term “anything of value” “must be given the broadest possible construction, including any conceivable thing of the slightest value [movable or immovable, corporeal or incorporeal, public or private, and including transportation, telephone and telegraph services, or any other service available for hire.] It must be construed in the broad popular sense of the phrase, not necessarily as synonymous with the traditional legal term ‘property.’ ” Id. This is consistent with the legislative intent to make illegal the use of “anything of value” for the purpose of committing or furthering the commission of criminal activity money laundering. Thus, there is no requirement in La. R.S. 14:230(B)(2) that the defendant know that the “anything of value” was derived from criminal activity; however, the “[t]he Advisory Committee believes [that] the statute requires the defendant to have knowledge that the proceeds are derived from criminal activity.” See Authors ’ Comment, § 10:228.
The evidence presented in the light most favorable to the prosecution, established that the money laundering charge herein arose out of an elaborate scheme that was orchestrated, designed, and implemented by Lemoine, who was the president of the corporate entity, Morel G. Lemoine Distributors, Inc. (“Lemoine Distributors”). The scheme was designed in 1995 by Lem-oine after he obtained a contract to supply fuel for locomotives for Union Pacific Railroad |a(“UPRR”). The criminal activity was designed to take full advantage of the lack of a fuel monitoring system by UPRR. Fuel was dispensed by Lemoine Distributors’ drivers directly into the railroad locomotives. This fueling occurred on locomotives around the clock on a 24-hour basis. Lemoine Distributors’s drivers went to Va-lero Refinery Company or Placid Refinery Company to fill up their 5,000 gallon bob tail trucks. They then proceeded to UPRR and placed the fuel directly into the locomotives. The drivers were given manifests from the two fuel distributors showing the amount and type of fuel received. When the drivers put the fuel in the locomotive, they wrote down the locomotive number and indicated the amount of fuel dispensed at the bottom of the manifest. The manifests were then collected - by the lead driver and turned over to the dispatcher, who calculated the total gallons dispensed from the field tickets. An invoice was then sent to UPRR for payment. From 1995 to 1997, the lead driver was Keith Glaser and the dispatcher was Rex Averill. Glaser would collect all the manifests from the other drivers daily. The manifests indicated the actual amount of fuel dispensed into each locomotive; however, Glaser then constructed a field ticket that contained inflated, “phantom” gallons of fuel. Averill created an invoice to UPRR based on the inflated field ticket and billed UPRR for the fuel that was never delivered. Averill paid Glaser “hush money” for padding the field tickets. Ave-rill, as instructed by Lemoine, then sold extra inventory to farmers for cash, which was given directly to Lemoine. Sometime in late 1997, an employee, Johnny Glaser (Keith Glaser’s brother) was fired and threatened to disclose the scheme to UPRR. This prompted Lemoine to instruct Averill and Lemoine’s wife, Veronica, to “scratch out” the actual fuel gallons written on all the prior fuel manifests. The manifests from 1995 to 1997 revealed the “scratch out” amounts. Averill also kept tract of the over billed, “phantom” gallons charged to UPRR as instructed by Lemoine.
DBeginning in 1998, the scheme changed because of fuel monitoring controls implemented by UPRR. Partial fuel dispensed *51 was not written on the manifests or on field tickets, but was transposed onto shop towels or small pieces of paper. Keith Glaser was no longer employed, so from January 1998 through March 6, 1998, Ave-rill continued to inflate the fuel invoices to UPRR and throw away the small pieces of paper with the record of the actual gallons pumped into the locomotives. This scheme ended on March 6, 1998, when UPRR implemented its own fueling system.
This scheme included the crimes of theft over $500.00, fraud, racketeering, and money laundering. The principal and co-conspirators to these crimes were the defendant, Martin G. Lemoine; Morel G. Lemoine Distributors, Inc., whose president was the defendant; Keith Glaser, an employee and the lead driver for the corporation; Rex Averill, employee and the dispatcher for the corporation; and Veronica Lemoine, the defendant’s wife. The statute of limitations ran on all state crimes except money laundering between January 20,1998 and March 6,1998.
The defendant was convicted by a unanimous jury of violating La. R.S. 14:230(B)(2) in the amount of $20,001.00. In reviewing the evidence in the light most favorable to prosecution, the jury could have easily found that the state proved the elements of this crime beyond a reasonable doubt, thus, the trial court erred in granting the motion for post-verdict judgment of acquittal. In affirming the judgment of the trial court, the majority first errs when it notes that there was a similarity between La. R.S. 14:230(B)(2) and 18 USCA § 1956. Louisiana Revised Statutes 14:230(B)(2), in pertinent part, criminalizes the giving, selling, transferring, maintaining an interest in, or otherwise making available any thing of value known to be for the purpose of committing or furthering the commission of any criminal activity. On the other hand, 18 USCA § 1956(a)(1) requires a | ^“financial transaction” while “knowing that the property involved ... represents the proceeds of some form of unlawful activity.” While La. R.S. 14:230(B)(1) requires a “financial transaction” involving proceeds known to be derived from “criminal activity” and La. R.S. 14:230(B)(3)(4)(5) and (6) has similar language regarding “proceeds from criminal activity,” curiously La. R.S. 14:230(B)(2) (the provision under which the defendant was convicted) has no such requirement. Another dissimilarity between the federal statute and this state’s statute is that, pursuant to La. R.S. 14:230(B)(2), the thing of value must be “known to be for the purpose of committing or furthering the commission of any criminal activity” and thus,- is a general intent statute. While there is no “furthering” reference in 18 USCA § 1956(3)(a), it does contain a prohibition against “promoting the carrying on of specified unlawful activity.” If we construe that to “promote” is to “further” criminal conduct pursuant to the federal statute, then 18 USCA § 1956(a)(3) must be interpreted to require a specific intent, which requires a higher burden of proof by the prosecution. These distinctions must be remembered before applying federal case precedent to Louisiana statutory authority.
Next, the majority’s reliance on State v. Dudley, 2006-1087 (La.App. 1st Cir.9/19/07), 984 So.2d 11, is clearly misplaced. While Dudley defines money laundering and is correct in its analysis, Dudley is distinguishable since it involved a prosecution under La. R.S. 14:230(B)(1), which is similar to 18 USCA § 1956(a)(1)(B)®. Therein, Clarence Dudley was convicted of Medicaid fraud and money laundering. The money laundering conviction was based upon defendant’s actions to conceal or disguise the nature of the proceeds. However, as previously not *52 ed, based upon the defendant’s indictment herein and the charges read to the jury, the defendant was not charged with the provision involving concealment.
|fiThe majority further errs when it concludes that “some provisions in La. R.S. 14:230(B) have been drafted in such a way that the predicate offense has merged so completely with the offense of money launr dering, that it appears that the crime of theft would also constitute money laundering with no requirement of any additional element.” The majority then cites La. R.S. 14:230(B)(6) to support this premise noting that the crime of theft would also include money laundering. The issue presented in this case involves La. R.S. 14:230(B)(2) only; therefore, consideration of La. R.S. 14:230(B)(6) is irrelevant. The majority then proceeds into a survey of federal jurisprudence to find the “proper understanding and application of the money laundering statute.”
In State v. Odom, 2007-0516 (La.App. 1st Cir.2008), 993 So.2d 663, 671 this court rejected the argument that the federal statute offered guidance to determine the money laundering issue presented therein, which was whether the definition of “funds” also included checks under the La. R.S. 14:230(a). This Court stated that “[wjhile our state statute uses the term ‘funds,’ the federal statute refers to ‘monetary instruments’ which are specifically defined as personal checks.... ” Id. This coúrt further noted that “the federal statute predates the enactment of the state statute in 1994 and if the legislature had intended to include the more expansive definitions it would have done so.” Id.
Additionally, in Odom, this Court correctly pointed out that “a criminal statute must be given a genuine construction consistent with the plain meaning of the language in light of its context and with reference to the purpose of the provision.” Id.; La. R.S. 14:3. This Court further explained that, “legislative intent is the fundamental question in all cases of statutory interpretation, and rules of statutory construction are designed to ascertain and enforce the intent of the statute. It is presumed .that the legislature enacts each statute with deliberation and with full |7knowledge of all existing laws on the same subject. Thus legislative language is interpreted by courts on the assumption that the legislature was aware of existing statutes, rules of construction, and judicial decisions interpreting those statutes. It is further presumed that the legislative branch intent to achieve a consistent body of law.” Odom, 991 So.2d at 671.
Further, the majority errs when it embarks upon an analysis of federal jurisprudence interpreting and applying 18 USCA § 1956 and § 1957 to find that the merger principal was applicable to most provisions of La. R.S. 14:230. It sets a dangerous precedent to judicially legislate in accordance with federal law and federal jurisprudence without attempting to ascertain the Louisiana legislative intent. Had the legislature wanted the Louisiana money laundering statute to incorporate the elements of 18 USCA § 1956 and § 1957, it could have codified those statutes completely. It did not.
Turning to the Louisiana legislative intent, the origin of La. R.S. 14:230 began in the administration of criminal justice committee as House bill 32 on June 20, 1994 during the 1994 Third Extraordinary Session. The bill was introduced by Representative Jetson, and he indicated that HB 32 “would prohibit certain financial transactions involving proceeds from criminal activity or “money laundering.” Notably the original bill did not contain La. R.S. 14:230(B)(2) as it appears in' the final act. Amendments were adopted by the house and senate, which are reflected in the engrossed, re-engrossed and final act 78, including La. R.S. 14:230(B)(2) as currently *53 written, The clear legislative intent was to prohibit transactions involving the proceeds of criminal activity. Louisiana Revised Statutes 14:230(B)(2) should then be read so as to prohibit the giving, selling, transferring, trading, concealing, transporting anything of value derived from criminal activity known to be for the purpose of committing or furthering the | ^commission of criminal activity. Importantly, neither the statute itself nor its legislative history requires or indicates when the proceeds or thing of value must be derived from criminal activity. Since money laundering must be a separate and distinct crime from the underlying criminal activity, (the merger doctrine) the money laundering and only the money laundering transaction must be done during the charged period as set forth in the indictment. Applying these principals to the . case facts in the light most favorable to the prosecution and the charged offense, the jury was correct in finding the defendant-guilty of money laundering.
Did the defendant have proceeds or anything of value derived from criminal conduct? The answer is yes. Based on the overwhelming evidence, the défendant orchestrated an overbilling scheme, charging UPRR for fuel’it did not receive. This began in 1995, when defendant’s company was awarded the contract to fuel locomotives for UPRR (the victim) and continued through March 6,1998.
Did the defendant obtain anything of value during the charged period that was derived from criminal activity? Again, the answer is yes. The testimony indicated and evidence established that the defendant’s corporation received checks for fuel payments during the charged period, which included inflated dollar amounts from overbilled fuel. The defendant directed that the proceeds go directly into his corporate account, except for the cash he received from the sale of excess fuel to farmers. Did the defendant knowingly give, sell, transfer, maintain an interest or otherwise make available the illegal funds during the charged period? Certainly the jury could have easily concluded that the defendant maintained an interest in the illegal, overbilled money or that he made the proceeds available to his corporation, himself and his dispatcher Rex Averill. The majority opinion is consistent with the above analysis up to this point. The majority errs when it finds the illegal proceeds of criminal activity were not used by defendant for the | ^“purpose of committing or furthering the commission of criminal activity.” This .erroneous analysis begins when they majority finds La. R.S. 14:230(B)(2), as written, creates a “merger” issue, compares 18 USCA § 1956(a)(l)(B)(i) . with La. R.S. 14:230(B)(2), and cites U.S. v. Sanders and U.S. v. Edgmon, which are cases that discuss the “concealment prong” of the 18 USCA § 1956, which is not applicable to this case. However, as set forth above, the defendant toas not charged with concealment; therefore, this portion of their analysis and case law is legally incorrect.
The critical issue in this case is whether the defendant knew the money from the illegally billed fuel “would be used for the purpose of committing or furthering the commission of any criminal activity.” The evidence clearly showed that three principals — the defendant, his corporation, and Rex Averill — were paid and received money during the charged period. A portion of this illegal money made up their salaries. A major portion of Rex Averill’s job duties during the charged period included performing' illegal acts. The defense claimed that Averill had to'be paid extra for his illegal actions in order for the defendant to be guilty of money laundering. However, Averills continued employment required that he continue-his participation in the over billing scheme. He was being paid -with some portion of the illegally *54 billed money by the corporation in order to continue the illegal overbilling scheme. No doubt this was true, because when he was fired in 2002, he reported the scheme. The defendant, Lemoine, was also being paid with a portion of the illegal money. The jury also heard testimony that the defendant was pocketing cash from the sale of the fuel to farmers that his corporation had already over billed UPRR for. Thus, the jury reasonably concluded that the illegally obtained money was being used for committing and furthering the overbilling scheme. See United States v. Valdez, 726 F.3d 684, 691 (5th Cir.2013) (finding |inthat the evidence was sufficient to prove money laundering based on promotion of unlawful activity where there was a -reasonable inference from the evidence that the defendant’s employees received payments to encourage their continued participation in the fraudulent scheme, and thus, the payments promoted the ongoing fraud.)
The defendant argues that the portion of salaries paid with illegally obtained proceeds are “legitimate business expenses,” and therefore can not constitute money laundering. The question becomes is it ever a legitimate business expense to compensate an employee whose major job duty it is to break the law by overbilling? The answer to the question is NO. The majority concedes that if Averill had been paid one dollar extra for his illegal activity, the defendant would be guilty of money laundering. This does not make sense. Further, Averill testified, in explaining the cash sales to farmers of fuel, “when it got up to thirty, forty, fifty, or sixty thousand gallons, he [Lemoine] said, we gotta lose some fuel.” Averill further explained, “well, I would contact a farmer, make a fantastic deal, almost give the fuel away, but it’d be for a cash price.” When asked who got the cash, Averill testified “I’d give it to Marty,” the defendant. While there was no direct testimony that defendant received cash during the charged period, there was testimony that during the charged period UPRR was charged for 2,087,937 gallons of fuel. If, as testified, there was at least a five percent overbilling rate, the jury could have circumstantially concluded that sales of fuel to farmers and receipt of cash by defendant occurred during the charged period. The majority, rightly so, shows, great concern that the money laundering statute should not be interpreted as “a money spending” statute, i.e., any expenditures of illegal proceeds would result kfin a money laundering conviction.[1] However, the facts of the case are far from a money spending scenario.
The jury could have also reasonably determined that the purchase of 2,087,937 gallons of diesel fuel during the charged period was done partially with the illegal proceeds. Certainly, the purchase of diesel would normally be a legitimate purchase for a fuel distributor; however, this product was a necessary element — an integral part of the overbilling, bill padding scheme. Therefore, the purchase of the diesel fuel with illegal money was for the purpose of furthering the illegal conduct.[2]
[3] The evidence, as construed under Louisiana law, clearly shows that the defendant is guilty of money laundering.
Regarding the amount of illegal proceeds laundered during the charged peri *55 od, the evidence was all over the board. The jury concluded that the money |12laundering value was $20,001.00. The jury obviously listened to the experts, but ultimately relied on Rex Averill’s testimony, wherein he indicated that he did not know where the profits or “ill gotten gains went,” but that it was “a lot of money” and “exceeded twenty thousand dollars.” Hence the jury’s value of $20,001.00 was not unreasonable. This was not a guess by Averill since he kept track of the excess billing on an overage report.
Essentially, the majority reasons that La. R.S. 14:230(B)(2) is similar to 18 USCA 1956 A(a)A(i); therefore, we should look to federal jurisprudence to get the proper prospective on Louisiana Law, although it concedes that the statutes differs on the intent element, ie., state law requires general intent whereas federal law required specific intent. However, we do not need to resolve this case by resorting to federal jurisprudence, but rather, by evaluating the language of the statute itself and its legislative intent. If we asked the 101 state representatives and 35 state senators, who were present in chambers when the bill enacting the money laundering statute was presented and unanimously passed, whether the defendant’s conduct constituted money laundering, the answer would be yes. When the question was posed to the jury, who heard all of the evidence and made the credibility determinations, whether the defendant’s conduct constituted money laundering, the answer was a resounding and unanimous yes.
I was impressed with the prosecution, defense attorneys, and the trial judge, during the trial as they grappled with the complex issues concerning the Louisiana’s money laundering statute, as evidenced by the numerous side bar discussions. Hopefully, the Louisiana Supreme Court will give some much needed guidance to interpreting this statute.
Based upon all the foregoing, I would reverse the judgment of the trial court and reinstate the jury’s verdict.

. See also United States v. Kelley, 471 Fed.Appx. 840, 845 (11th Cir.2012) (upholding a money laundering conviction because a reasonable jury could conclude "that the monthly dividend payments were designed to give the principal players in the steroid distribution scheme an incentive to continue their activities despite the risks inherent in such activity”).

. The majority, relying on United States v. Brown, 186 F.3d 661, determined that the *55 purchase of fuel by the defendant was a legitimate business expense. In Brown, the court evaluated the expenditures made by the defendant — an automobile dealer — and determined that although the expenditures permitted the dealer to stay in business, and thus, generally allowed for the future fraudulent activity, absent proof that such expenditures were intended to promote specified unlawful activity, the expenditures were “above board" business expenses and thus, did not amount to money laundering. In Brown, 186 F.3d at 668 n. 13, the business expenses at issue were for: (1) parts, paints, and materials; (2) the floor plan; (3) software support and office supplies; (4) conversions; (5) used cars; (6) disposal of waste oil and used oil filters; (7) t-shirts, caps, coffee mugs; (8) yearbook advertisements; (9) a computer system lease; (10) advertising representation; (11) defendant’s travel expenses; (12) extended warranties on used automobiles; (13) glass replacement; (14) automobile association membership fees; (15) photocopier supplies; and (16) a health plan.
I agree with Brown, that for an automobile dealer, these types of expenses were legitimate expenses, and therefore, did constitute money laundering. However, monetary payments to principals and co-conspirators, which serve to reward them for their participation in ongoing criminal conduct, can never be considered legitimate business expenses,

. See also United States v. Brown, 553 F.3d 768, 78 Fed.R.Evid. Serv. 180 (5th Cir.2008) wherein the defendant pharmacists were convicted of promotional money laundering. Essentially they bought promethazine with codeine and hydrocodone legally. However, they illegally sold arid dispersed the products resulting in high profits. The court determined that the purchase of the legal product with profits of the illegal transactions were in fact promotional money laundering.