984 So.2d 11 (2007)
STATE of Louisiana
v.
Clarence DUDLEY and Jacklin Gerac Dudley.
No. 2006 KA 1087.
Court of Appeal of Louisiana, First Circuit.
September 19, 2007.
*14 Charles C. Foti, Jr., Attorney General, Tasha K. West, Assistant Attorney General, Baton Rouge, Counsel for Appellee State of Louisiana.
S. Marie Johnson, New Iberia, Counsel for Defendant/Appellant Clarence Dudley.
Clarence Dudley, Angola, Defendant/Appellant In Proper Person.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
*15 GAIDRY, J.
The defendant, Clarence Dudley, appeals his convictions of Medicaid fraud, theft, and money laundering, as well as a related habitual-offender sentence.[1] Clarence Dudley and his wife, Jacklin Gerac Dudley (also known as Jacklin Ogashi), were each charged by amended bill of information with one count of conspiracy to commit Medicaid fraud (count I), a violation of La. R.S. 14:26 and 14:70.1; nine counts of Medicaid fraud (counts II-X), violations of La. R.S. 14:70.1; and one count of theft of more than $1,000.00 (count XI), a violation of La. R.S. 14:67. Clarence Dudley was also charged by the same amended bill of information with one count of money laundering of $100,000.00 or more (count XII), a violation of La. R.S. 14:230. They pleaded not guilty on all counts. Following a jury trial and a unanimous verdict, they were found not guilty on count I; on counts II through XI, they were both found guilty as charged; and on count XII Clarence Dudley was found guilty as charged. They moved for a new trial and for arrest of judgment, but their motions were denied. On counts II through X, both were sentenced to five years at hard labor on each count, each sentence to be served concurrently; on count XI, they were sentenced to ten years at hard labor to run consecutively to the sentences imposed on counts II-X. On count XII, Clarence Dudley was sentenced to ten years at hard labor, the sentence to be served consecutively to the sentences imposed on counts II-X and the sentence imposed on count XI. Jacklin Dudley moved for reconsideration of sentence, but her motion was denied. Following a restitution hearing, the court rendered a civil money judgment of $5,744.49 in favor of the Louisiana Department of Health and Hospitals (DHH) and against both defendants; ordered both to pay $7,993.65 restitution to the Attorney General's Office; and ordered Clarence Dudley to pay $374,598.33 restitution to DHH.
The state subsequently filed a habitual-offender bill of information against Clarence Dudley alleging that, in addition to count XII, he had previously been convicted in Tangipahoa Parish of possession with intent to distribute cocaine, a violation of La. R.S. 40:967(A)(1), and possession of cocaine, a violation of La. R.S. 40:967(C) (Predicate #1). Following the habitual-offender hearing, Clarence Dudley was adjudged a second-felony habitual offender in regard to count XII, the previously imposed sentence on that offense was vacated, and he was sentenced to fifty years at hard labor. He moved for reconsideration of the habitual-offender sentence, but the motion was denied. He now appeals, designating five assignments of error.[2] We affirm the convictions and sentences on counts II-X; we vacate the conviction and sentence on count XI; and we affirm the conviction, habitual-offender adjudication, and sentence on count XII.

ASSIGNMENTS OF ERROR
Defendant has assigned error on the part of the trial court in the following respects:
(1) Defendant's prosecution for Medicaid fraud, felony theft, and money laundering constituted a violation of the federal and state constitutional bars against double jeopardy.
(2) The Parish of East Baton Rouge was not a parish of proper venue for the prosecution *16 of defendant for these crimes, and further, the attorney general's office did not have jurisdiction over him.
(3) The trial court erred in failing to assess defendant's competence to waive counsel according to the standard appropriate for measuring competence of counsel against professional norms.
(4) There was insufficient evidence to justify a rational trier of fact to find defendant guilty beyond a reasonable doubt.
(5) The trial court erred in finding defendant to be a habitual offender when the State failed to establish by competent evidence the necessary elements outlined in State v. Shelton, 621 So.2d 769 (La.1993). Alternatively, the trial court erred in failing to reduce the mandatory minimum sentence imposed, as it was grossly out of proportion to the seriousness of the offense and nothing more than a needless infliction of pain and suffering in violation of La. Const. art. I, § 20.

FACTS
The defendant, Clarence Dudley, was the pastor of True Divine Full Gospel Ministry in New Iberia, Louisiana, and his wife Jacklin Gerac Dudley, was its "Elect Lady." Ms. Dudley was also a registered nurse who had previously worked at Warbash Kidmed Clinic in New Iberia. In late 2000 or early 2001, the Dudleys began operating the Westend Kidmed clinic (Westend) in the same building as True Divine Full Gospel Ministry. Clarence Dudley incorporated Westend (as Westend Kidmed, Inc.), and was its registered agent, director, and administrator.
The Early and Periodic Screening, Diagnosis and Treatment (EPSDT) Program is a Medicaid program established by the federal government in 1967. The screening component of EPSDT is called KIDMED and provides for medical, vision, hearing, and dental screening services. The purpose of a KIDMED clinic is to provide screening and preventative health care services to Medicaid-eligible children and young adults under the age of twenty-one years. A KIDMED clinic is required to have a registered nurse and a physician at the clinic.[3] Additionally, "Denver II" assessments or tests on eligible patients under six years old are required to be performed by a nurse with certification in the "Denver II" testing protocol. EPSDT and KIDMED services in Louisiana are administered by DHH as one of the programs under the Louisiana Medicaid Program.
Scarlett Etheridge, a Louisiana KIDMED Regional Nurse, testified that when she visited Westend on February 28, 2001, Jacklin Dudley told her that she was in the process of becoming Denver II certified and that April Babin, a Denver II certified nurse, was working at Westend.[4] Etheridge testified that during a May 29, 2001 visit to Westend, she discussed "linkage" with Jacklin Dudley. In order for a parent to obtain KIDMED health screening for a child, the parent had to "link" that particular child to a particular KIDMED clinic. As of August of 2001, Westend had 21 children linked to the clinic. Jacklin Dudley advised Etheridge that over 1,000 children should have been linked to Westend. Etheridge referred the Dudleys to Unisys.[5] Etheridge confirmed that Jacklin *17 Dudley was very familiar with the KIDMED Provider Manual and its billing procedures. Etheridge also explained that the KIDMED Provider Manual required face-to-face visits with the child being treated, not telephone visits.[6]
April Babin testified that she worked as a Denver II screener at Westend from May of 2001 until August of 2001. Babin stated that Jacklin Dudley ordered her to check every medical chart at the clinic to verify that the chart reflected that a Denver II test had been performed on the child. Babin confirmed that she was not the person with the initials "AB" who supposedly performed a Denver II test on Trah'Nae St. Julien on February 2, 2001, and a retest on February 18, 2001. Babin also indicated she did not perform the Denver II test (which had been incorrectly performed) supposedly performed on Tracy St. Julien on March 1, 2001. According to Babin, Jacklin Dudley instructed her to disregard the actual dates Babin tested children and to use dates that matched billing dates. Babin also indicated that Jacklin Dudley instructed her, Janeen Turner, R.N., and "Phoenicia," another nurse, to match counseling notes to billing dates and supplied the nurses with examples of what to write. The nurses then gave the completed notes to Turner, who told Babin that Jacklin Dudley would sign the notes. Babin also testified that the Dudleys paid $5.00 per child to anyone who brought a Medicaid-eligible child not already been registered to Westend. After Babin left Westend, she was contacted by Alicia Butler, an attorney, who cautioned her that she would be sued if she breached confidentiality.
Between March 12, 2001 and September 19, 2001, Westend submitted 11,587 Medicaid claims and was paid $402,390.63 for the claims. The majority of the claims (8,642 claims totaling $355,445.46) were nurse consultation claims. The next largest number of claims (1,816 claims totaling $24,897.36) were nutritional consultation claims. Only approximately 370 of the claims were for vision or hearing screening, and only three of the claims were for immunizations.
Westend maintained a bank account at Community First Bank. Between February 1, 2001 and October 30, 2001, defendant withdrew $92,248.09 from the Westend bank account. Between March 13, 2001 and October 30, 2001, he cashed $116,006.70 of checks written to himself on the account. Additionally, between March 13, 2001 and October 30, 2001, $3,860.00 in checks payable to cash and bearing the signature "Clarence Dudley" were also cashed on the account. Virginia Rider, an investigator of the Medicaid Fraud Control Unit of the Louisiana Department of Justice, testified that in examining Westend's bank account activity, she noted that defendant had used cashier's checks (referred to by Community First Bank as "official checks") to withdraw money from the account, held the proceeds for a few days, and then redeposited the checks into the account, taking some of the proceeds in new cashier's checks and some of the proceeds in cash, and leaving some of the proceeds in the account.
Anegra St. Julien testified that she was the mother of Tracy St. Julien (the Medicaid recipient listed in count IX) and Trah'Nae St. Julien (the Medicaid recipient listed in count X). According to Ms. St. Julien, Tracy and Trah'Nae visited Westend on only one occasion. The state introduced records, however, showing that Westend billed and was paid $407.46 by Medicaid for services purportedly provided by Jacklin Dudley to Tracy St. Julien on *18 nine different dates between February 8, 2001 and March 10, 2001.[7] The state also introduced records indicating Westend billed and was paid $297.78 by Medicaid for services purportedly provided by Jacklin Dudley to Trah'Nae St. Julien on seven different dates between February 11, 2001 and March 14, 2001. Ms. St. Julien also worked at Westend from November of 2000 until May of 2001. She confronted Jacklin Dudley concerning billing for services allegedly provided to children when they were not actually at Westend. Ms. Dudley claimed that she had to bill separately for different services and had consulted the children over the telephone.[8] After Ms. St. Julien left Westend, the Dudleys unsuccessfully sued her for $50,000.00, claiming she had slandered them and disclosed the contents of the files of Westend patients to their parents.
Christina Marie Davis testified that she was the mother of Christian Michael Davis (the Medicaid recipient listed in count IV). According to Davis, Christian visited Westend on only one occasion. The state introduced records, however, showing that Westend billed Medicaid and received payment for $983.28, supposedly for services provided to Christian on twenty-four different dates between February 9, 2001 and August 3, 2001. Jacklin Dudley was shown as providing services on eighteen of those service dates. Davis confronted Jacklin Dudley concerning the apparent excessive billing. Jacklin Dudley responded that Westend had simply made a mistake, claiming that the error occurred because there were two Christian Davises or because of a fundraiser.
Helen Thompson testified that she was employed at Westend from approximately July of 2001 until September of 2001. She indicated that Jacklin Dudley ran Westend and paid $5.00 per child for every child brought to Westend with a Medicaid card. Thompson said that Janeen Turner gave her a book with billing records and told her to write out notes for the billing dates in a form specified by Turner. Thompson also saw Babin, Herlima Polk, and Precious Doucet writing out notes for billing dates. When Thompson inquired of Turner why she was to prepare notes for September 2001 bills prior to that month, Turner took the papers away from her.
Precious Doucet testified she was the mother of Corderriol Mason (the Medicaid *19 recipient listed in count V), Donovan Mason (the Medicaid recipient listed in count VI), John Mason (the Medicaid recipient listed in count VII), and Terresa Mason (the Medicaid recipient listed in count VIII).[9] Doucet confirmed that Corderriol went to the clinic one time for a checkup and one time to be in a commercial. The state introduced records, however, indicating that Westend billed Medicaid and received payment for $730.39 of services represented as being provided to Corderriol on twenty different dates between July 12, 2001 and August 25, 2001. Jacklin Dudley allegedly provided services on eleven of the service dates shown.
Doucet also testified that Donovan went to Westend for treatment on only one occasion. Records introduced by the state again revealed that Westend billed and received $730.39 in payment from Medicaid for services purportedly provided to Donovan on twenty different dates between July 12, 2001 and August 25, 2001. Once again, Jacklin Dudley allegedly provided services on eleven of those service dates.
Doucet indicated that her son John also went to the clinic for treatment on only one occasion. The state produced records, however, establishing that the clinic actually billed, and received payment from Medicaid, for $607.00 of services allegedly provided to John on seventeen different dates between July 12, 2001 and August 15, 2001. Jacklin Dudley allegedly provided services on seven of those service dates.
Doucet stated that her daughter Terresa went to Westend one time to be on a billboard and perhaps one time for a checkup. The state introduced records, however, indicating Westend billed and was paid $771.52 by Medicaid for services allegedly provided to Terresa on twenty-one different dates between July 12, 2001 and September 14, 2001. Jacklin Dudley purportedly provided services on seven of those dates.[10]
Finally, Doucet also testified that defendant hired her as marketing director of Westend, and that she worked at the clinic from approximately May 23, 2001 until September 26, 2001. According to Doucet, the Dudleys owned Westend. She was paid $5.00 per "new" child (with a Medicaid card) whom she brought to Westend. Doucet also admitted that she filled out blank nurses' notes at various times at the direction of either Janeen Turner or Jacklin Dudley.
Mary Yolanda Narcisse testified she was the mother of Craig Babers, Jr. (the Medicaid recipient listed in count II) and Mahogany Narcisse (the Medicaid recipient listed in count III), both of whom had been to Westend on only one occasion each. According to the state's records, Westend received payment from Medicaid for $575.82 for bills for services provided to Craig on fourteen different dates between June 16, 2001 and July 30, 2001. Jacklin Dudley supposedly provided services to Craig on twelve of those service dates. Also introduced were records showing that Westend billed, and received payment from Medicaid, for $534.69 for services allegedly provided to Mahogany on fifteen different dates between June 18, 2001 and August 3, 2001. Jacklin Dudley was not listed as providing services on any of the service dates, but six of the dates had no entry as to which nurse had provided the service. The children, Craig Babers, Jr. *20 and Mahogany Narcisse, also testified. Craig testified that his date of birth was August 5, 1991 and confirmed that he had been to Westend as a patient on only one occasion. Mahogany testified that her date of birth was January 24, 1989 and likewise verified her mother's testimony that she went to Westend as a patient only once.
Tasa Jones testified that defendant hired her to work at Westend from approximately April of 2001 to May of 2001. According to Jones, Jacklin Dudley told her that she would see billing records for children she had not seen at Westend because the person who previously held her position had failed to bill for services for those children. Jones also indicated that following a visit from a representative of either Medicaid or DHH, defendant instructed her to telephone Medicaid, pretend to be the parents of certain children who were not "linked" to Westend, and to "link" those children to Westend. Jones refused to comply with defendant's instructions and her employment by Westend was terminated the following day.
Kasabiana Beals testified that she worked at Westend between April 25, 2001 and May 9, 2001. She identified a document offered by the state as a marketing contract between defendant, as "employer," and herself, providing that she would be paid $5.00 for every child she brought to Westend and who was seen at Westend. Beals explained that those children had to have "medical cards."
Phoenicia Neveu testified that she worked at Westend as a licensed practical nurse from May 23, 2001 until August 15, 2001. She admitted that the Dudleys asked her to sign blank nurse consultation forms, claiming they did not want to have to wait for the signatures before "charting."
Janis Souvestre was the Assistant Section Chief of the Program Operations Section of DHH's Medicaid Program. She identified a Medicaid KIDMED Provider Manual provided to Westend, and explained that the manual contained a telephone number for service providers to call to obtain more information. Souvestre described a medical screening as including taking medical history, performing a physical examination, giving immunizations (if necessary), performing laboratory work (if necessary), and health education. Souvestre explained that bringing children back to a KIDMED clinic after a medical screening and advising them about things like brushing their teeth, wearing a helmet when they rode a bicycle, or sex would not comply with the rules of the KIDMED Program. Souvestre emphasized that nurse consultations had to be face-to-face with the parent or the child, and that three units or actions were the maximum number of units that a nurse could charge in any one day.
Janeen Turner testified she worked as a registered nurse at Westend from approximately April of 2001 until October of 2001. She verified that the Dudleys instructed her to sign blank nurses' notes and to always bill Medicaid for three units per day, the maximum allowed. Turner also indicated that she usually spoke to groups of children at a time, and that Jacklin Dudley and defendant instructed her on how to use the sign-in sheets to bill for all of the children in the room.
Jacklin Dudley, defendant's wife and codefendant, also testified at trial. She denied falsifying, or telling anyone else to falsify, any records at Westend. She claimed that after Westend had been open for months, the clinic ran a television commercial on Martin Luther King Day. She claimed that the next day, DHH contacted Westend and stated that it would not provide *21 the clinic a provider number unless she and defendant[11] spoke to Joseph Kopsa, DHH's Program Manager in charge of program integrity. Ms. Dudley claimed that Kopsa had "problems" with the clinic, but would not disclose the nature of those problems. Ms. Dudley claimed that she and defendant asked Kopsa to let them know what the problems were, and requested technical assistance because they were unfamiliar with billing. Jacklin Dudley also claimed that even though employees of Westend called Unisys on a regular basis, no one from DHH came to Westend to assist it with billing.
Ms. Dudley claimed Anegra St. Julien lied on the stand in retaliation for a wrong committed by Ms. Dudley's brother. Ms. Dudley conceded that she billed the KIDMED Program for telephone visits, but claimed that billing was justified and permissible as "anticipatory guidance" under the KIDMED manual. She accused representatives of the Louisiana Department of Justice of forcing her, "under the threat of jail," to write and sign her name to nurses' notes and to place them in Westend patient files. She also claimed that Westend had actually received only $200,000.00, rather than $400,000.00, from the KIDMED Program.
On rebuttal, Ms. Rider expressly denied that she or any other Department of Justice investigator forced Ms. Dudley to write nurses' notes, sign them, and place them in the Westend records introduced into evidence.

DOUBLE JEOPARDY
In his first assignment of error, defendant contends that as the same evidence was necessary to prove Medicaid fraud, felony theft, and money laundering, he was unconstitutionally placed in double jeopardy.
The federal and state constitutions both provide that no person shall twice be put in jeopardy of life or liberty for the same offense. U.S. Const. amend. V; La. Const. art. I, § 15. The Double Jeopardy Clause protects the accused against multiple punishments for the same offense, as well as a second prosecution for the same offense after acquittal or conviction. In determining whether or not the double jeopardy prohibition has been violated, the Louisiana Supreme Court has recognized two different tests, i.e., the test established in Blockburger v. U.S., 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932),[12] and the "same evidence" test. However, in recent years, the Louisiana Supreme Court has principally relied on the "same evidence" test when evaluating double jeopardy claims.
Under the "same evidence" test, if the proof required to support a finding of guilt of one crime would also support conviction of another crime, the prohibition against double jeopardy bars a conviction for more than one crime. See State v. LeBlanc, 618 So.2d 949, 957 (La.App. 1st Cir.1993), writ denied, 95-2216 (La.10/4/96), 679 So.2d 1372.
The "same evidence" test focuses upon the actual physical and testimonial *22 evidence necessary to secure a conviction. This test depends upon the proof required to convict, not the evidence actually introduced at trial. Thus, under the "same evidence" test, the court's concern is with the "evidential focus" of the facts adduced at trial in light of the verdict rendered, i.e., how the evidence presented goes to satisfy the prosecution's burden of proof. Therefore, if the evidence required to support a finding of guilt of one crime would also support a conviction for another offense, the defendant can be placed in jeopardy for only one of the two. State v. Sandifer, 95-2226, p. 5 (La.9/5/96), 679 So.2d 1324, 1329.
Here, the evidential focus of the facts adduced at trial was that defendant and Jacklin Dudley committed Medicaid fraud when, with intent to defraud the state through a medical assistance program created under the federal Social Security Act and administered by DHH, they presented for payment false or fraudulent claims for services rendered at Westend or knowingly submitted false information for the purpose of obtaining greater compensation than that to which they were legally entitled for furnishing services at Westend. The state further contended that the Dudleys' actions also constituted theft as a taking of something of value that belonged to another by means of fraudulent conduct, practices, or representations. Lastly, the state contended that defendant's actions in obtaining certified checks for certain amounts from Westend's bank account, and then redepositing, cashing, and obtaining additional certified checks constituted money laundering, in that defendant knowingly conducted financial transactions involving proceeds he knew were derived from criminal activity to conceal or disguise the nature, location, source, ownership, or control of those proceeds.
Defendant's convictions for Medicaid fraud and money laundering did not violate the double jeopardy prohibition because the evidence required to support the finding of guilt of Medicaid fraud (the fraudulent billing) did not also support the conviction for money laundering (concealing or disguising the nature or source of proceeds derived from the Medicaid fraud). However, the evidence required to support the finding of guilt of theft, i.e., the taking of money (proceeds derived from Medicaid fraud) by means of fraudulent conduct, practices or representations (the fraudulent billing), did involve the same evidence required to support the Medicaid fraud convictions and the money laundering conviction. Thus, the "same evidence" test for double jeopardy is met in the latter case.
The procedure for remedying a violation of double jeopardy is to vacate the conviction and sentence of the less severely punishable offense, and to affirm the conviction and sentence of the more severely punishable. State v. McMooain, 95-2103, p. 7 (La.App. 1st Cir.9/27/96), 680 So.2d 1370, 1374. Accordingly, Clarence Dudley's conviction and sentence for theft of more than $1,000 (count XI) are hereby vacated.
In summary, defendant's first assignment of error has merit in part.

SUFFICIENCY OF THE EVIDENCE
In his fourth assignment of error, defendant argues that the evidence presented by the state failed to show that he committed Medicaid fraud or theft, or that he did any act that could be considered as directing another to commit Medicaid fraud or theft, or that he did anything that could be considered aiding and abetting another to commit such an act. He further argues that, absent such proof of his guilt of Medicaid *23 fraud or theft, he could not have been guilty of the crime of money laundering.[13]
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. State v. Wright, 98-0601, p. 2 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, XXXX-XXXX (La.11/17/00), 773 So.2d 732 (quoting La. R.S. 15:438).
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 98-0601 at p. 3, 730 So.2d at 487.
The reviewing court is required to evaluate the circumstantial evidence in the light most favorable to the prosecution and determine if any alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Smith, XXXX-XXXX, p. 5 (La.App. 1st Cir.12/31/03), 868 So.2d 794, 799.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. However, a defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. State v. Neal, 00-0674, pp. 12-13 (La.6/29/01), 796 So.2d 649, 659, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by DHH, presents for payment any false or fraudulent claim for furnishing services or merchandise or knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise. La. R.S. 14:70.1(A). Medicaid fraud is a specific-intent *24 crime. See State v. McDermitt, 406 So.2d 195, 202 (La.1981).
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Henderson, 99-1945, p. 3 (La.App. 1st Cir.6/23/00), 762 So.2d 747, 751, writ denied, 00-2223 (La.6/15/01), 793 So.2d 1235.
Louisiana's money laundering statute provides that it is unlawful for any person knowingly to conduct, supervise, or facilitate a financial transaction involving proceeds known to be derived from criminal activity, when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation. La. R.S. 14:230(B). The provision closely resembles 18 U.S.C. § 1956(a)(1)(B)(i). Thus, the federal jurisprudence interpreting the latter statute is highly instructive. See Wright, 98-0601 at p. 7, 730 So.2d at 489.
18 U.S.C. § 1956(a)(1)(B)(i) criminalizes conduct designed to conceal or disguise the source of proceeds of specified unlawful activity even if the defendant does not conceal his own identity in the process. See U.S. v. Hall, 434 F.3d 42, 50-51 (1st Cir.2006). Factors helpful in determining whether a transaction was designed to conceal include: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on the practices of criminals. U.S. v. Magluta, 418 F.3d 1166, 1176 (11th Cir.2005), cert. denied, 548 U.S. 903, 126 S.Ct. 2966, 165 L.Ed.2d 949 (2006).
After a thorough review of the record, we are convinced that the evidence, viewed in the light most favorable to the state, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of Medicaid fraud and money laundering and defendant's identity as a perpetrator of those offenses. The jury heard the defense arguments that defendant was unaware of any Medicaid fraud occurring at Westend. However, the jury also heard and obviously credited testimony that defendant directed Tasa Jones to impersonate the parents of "unlinked" Westend patients on the telephone and to "link" those children to Westend for billing. Jones was emphatic in her testimony that defendant, and not Jacklin Dudley, instructed her to do so. The jury also heard consistent testimony from several former nurses at Westend that defendant instructed them to sign blank nurse consultation forms, as well as testimony from the Medicaid Fraud Control Unit Investigator, Virginia Rider, regarding the highly unusual and irregular features of the transactions in which defendant withdrew and redeposited money from the Westend bank account.
The trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Lofton, 96-1429, p. 5 *25 (La.App. 1st Cir.3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La.10/17/97), 701 So.2d 1331. The guilty verdicts rendered against Clarence Dudley demonstrate that the jury reasonably rejected his hypothesis of innocence and concluded that he was at least a principal to Medicaid fraud and was also guilty of money laundering. In reviewing the evidence, we cannot say that the jury's determinations are irrational under the facts and circumstances presented to them. See State v. Ordodi, XXXX-XXXX, p. 14 (La.11/29/06), 946 So.2d 654, 662. We will not attempt to assess the credibility of witnesses or to reweigh the evidence to overturn a factfinder's determination of guilt.
Additionally, defendant's assertion that he could not be guilty of money laundering without proof of his guilt of conspiracy to commit Medicaid fraud, of Medicaid fraud, or of theft is incorrect. Money laundering is a financial transaction crime involving the proceeds of some other crime; there is absolutely no requirement that a defendant accused of money laundering also be involved in the underlying crime. See U.S. v. Awada, 425 F.3d 522, 525 (8th Cir.2005).
Defendant's fourth assignment of error has no merit.

VENUE AND PROSECUTION BY ATTORNEY GENERAL
In his second assignment of error, defendant argues that East Baton Rouge Parish was not a parish of proper venue because he committed no acts in East Baton Rouge Parish and was not a citizen or resident of that parish. He also challenges the jurisdiction of the attorney general to prosecute him.
Louisiana Constitution art. I, § 16 requires that every person charged with a crime has the right to an impartial trial "in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law." Louisiana Code of Criminal Procedure art. 611(A) provides:
All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.
Prior to trial, Jacklin and Clarence Dudley moved to quash based on improper venue. The trial court denied the motion, noting that although the case could have been tried in New Iberia, the case was not required to be tried in New Iberia. On a pre-trial motion, the trial judge is not required to find that a crime charged was committed beyond a reasonable doubt, but only that venue is proper by a preponderance of the evidence. State v. Gentry, 462 So.2d 624, 628 (La.1985); State v. Odom, 02-2698, p. 6 (La.App. 1st Cir.6/27/03), 861 So.2d 187, 198, writ denied, 03-2142 (La.10/17/03), 855 So.2d 765.
There was no error in the court's ruling on venue. The Medicaid fraud and money laundering were properly found to have been committed in East Baton Rouge Parish because acts constituting the offenses or elements of the offenses occurred in East Baton Rouge Parish. Nelson Bergeron, Westend's Medicaid biller, testified that Westend sent billing information by facsimile telecopier to him in Baton Rouge. Joseph P. Martinez, IV testified that he was a programmer for Unisys, which issued checks in payment of Medicaid claims billed to DHH in Baton Rouge. Westend submitted Medicaid claims to Unisys in Baton Rouge under its provider number 1417203. Additionally, because the criminal *26 conduct at issue depleted the funds of DHH, the force or effect of the Medicaid fraud and money laundering was felt in East Baton Rouge Parish. See Odom, 02-2701 at pp. 9-10, 861 So.2d at 201.
There was likewise no error in prosecution of this matter by the attorney general. The record establishes that the East Baton Rouge Parish district attorney requested by letter that the attorney general prosecute this case. As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority upon the written request of a district attorney, to advise and assist in the prosecution of any criminal case. La. Const. art. IV, § 8. A district attorney's letter requesting the assistance of the attorney general's office in prosecuting a criminal case is a sufficient constitutional predicate for the attorney general's involvement in the prosecution of the case itself. McDermitt, 406 So.2d at 204.
This assignment of error is without merit in either of its respects.

FAILURE TO ASSESS COMPETENCE TO WAIVE COUNSEL
Defendant frames the issue presented by his third assignment of error as follows: "The question presented here is where a defendant makes repeated verbal and written requests to exercise his Sixth Amendment right to self-representation, despite his attempts to make some use of appointed indigent counsel, should the trial court at least inquire as to whether or not defendant is competent to waive counsel and exercise that right."
An accused has the right to choose between the right to counsel, guaranteed in the state and federal constitutions, and the right to self-representation. U.S. Const. amend. VI; La. Const. art I, § 13. However, the choice to represent one's self must be clear and unequivocal. Requests that vacillate between self-representation and representation by counsel are equivocal. Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each. State v. Leger, 05-0011, p. 53 (La.7/10/06), 936 So.2d 108, 147-48, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).
At arraignment on September 3, 2002, after defendant represented that he could not afford to retain counsel, the office of the public defender was appointed to represent him. Assistant Public Defender Bo Rougeou conferred with defendant, and he entered a not guilty plea.
On November 12, 2002, defendant filed a pro se motion requesting adequate counsel. He complained that counsel had not instructed him on any matter concerning the charges asserted against him.
On February 3, 2003, defendant filed a motion to terminate appointed counsel. He complained Rougeou had determined that he (defendant) was guilty.
On February 13, 2003, defendant appeared in court with Assistant Public Defenders Rougeou and Barry Milligan for a motion hearing. Defendant stated that he would hire Jo Flynn as counsel, and the matter was reassigned for March 13, 2003.
On March 13, 2003, defendant appeared in court with Milligan for a status hearing. Trial was set for August 18, 2003, and the matter was continued.
On May 15, 2003, defendant appeared in court with Rougeou for a motion hearing. On July 23, 2003, Rougeou moved to withdraw from representing defendant. On July 25, 2003, defendant appeared in court with Rougeou for a status hearing. The *27 trial court granted the prior motion to withdraw from representation, noting that the motion indicated that defendant had not cooperated with counsel and that he was displeased with the advice of counsel and his representation. The court also noted defendant had testified in a deposition that he had a monthly income, and ordered him to return to court in ten days with privately retained counsel.
On August 4, 2003, defendant appeared in court in proper person. The trial court then appointed Jonathan Holloway to represent Clarence Dudley.
On September 3, 2003, defendant appeared in court with Holloway for a status hearing. On October 2, 2003, defendant appeared in court with Holloway for a motion hearing. The defense moved for a continuance of the trial, and the court reassigned the trial to March 1, 2004. On February 13, 2004, defendant appeared in court with Holloway and Victor Woods for a status hearing.
On February 27, 2004, defendant filed a pro se "motion for self-representation/motion to continue." In his motion, he requested self-representation, but also claimed that he was entitled to "[a] legal Coach to advise the [d]efendant of variety of strategies, legal issues, and the law." Defendant complained that counsel had failed to respond to his inquiries about the case, had not had any motion hearings, had not interviewed witnesses, had not issued subpoenas, and had not had time to prepare for trial.
On March 1, 2004, defendant appeared in court with Holloway and Woods for trial. The defense moved for a continuance of the trial, and the court reassigned the trial to July 26, 2004.
On July 19, 2004, defendant appeared in court with Woods for a status hearing. On July 26, 2004, he appeared in court with Woods for trial. The trial court, ex proprio motu, ordered the trial continued to July 27, 2004.
On July 27, 2004, Clarence Dudley appeared in court with Woods for trial as previously scheduled. The defense moved to continue the trial, and the trial court reassigned the trial for November 29, 2004.
On October 27, 2004, defendant appeared in court in proper person for a status hearing. On November 29, 2004, Clarence Dudley appeared in court with Woods for trial. Defendant then stated that he did not want Woods as his counsel, but instead wanted S. Marie Johnson as counsel. Defendant advised the trial court that he thought Johnson would be available "in about a week or two[.]" The trial court thereupon told defendant that if he wanted Johnson to represent him he needed to have her in court the following day. The court then reassigned the trial to the following day, November 30, 2004, noting:
Well, at least on behalf of Mr. Dudley, that I'm aware of, and I guess Mrs. Dudley, there's been attempts to ask that they represent themselves. And at the same time there's been attempts to tell me that they're going to hire a lawyer. And it seems to me that every time we get to trial they either want to hire a lawyer or either they want to fire the ones they got, which seems to me that they're just trying to delay the thing. Every time this comes up, that happens. Mr. Dudley, just this morning has said he hired Ms. Marie Johnson and that she will be his lawyer now. And, of course, she wants a continuance because she can't be here today. He wants to have a lawyer, get a continuance, and then he'll probably fire her by the next trial date and then we'll be in the same situation. This continues over and over and over again. And I've *28 let it happen, and I've let it happen, but it seems to me now this has just gotten completely dilatory.
Trial began on November 30, 2004, with Woods representing Clarence Dudley.
In the instant case, defendant was not denied his right of self-representation; rather, he simply failed to clearly and unequivocally invoke his right to self-representation. His competency to waive his right to counsel was never at issue.
This assignment of error is without merit.

HABITUAL OFFENDER ADJUDICATION AND EXCESSIVE SENTENCE
In his fifth assignment of error, defendant argues that the state failed to prove he was the same person convicted of Predicate #1. Alternatively, he argues the mandatory sentence as applied to him was constitutionally excessive.
To obtain a multiple-offender adjudication, the state is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. In attempting to do so, the state may present: (1) testimony from witnesses; (2) expert opinion regarding the fingerprints of the defendant when compared with those in the prior record; (3) photographs in the duly authenticated record; or (4) evidence of identical driver's license number, sex, race and date of birth. State v. Payton, 00-2899, p. 6 (La.3/15/02), 810 So.2d 1127, 1130. The Habitual-Offender Act does not require the state to use a specific type of evidence to carry its burden at a habitual-offender hearing, and prior convictions may be proved by any competent evidence. Payton, 00-2899 at p. 8, 810 So.2d at 1132.
In the instant case, the habitual-offender bill of information alleged that in addition to count XII, Clarence Dudley, a black male, with a date of birth of "12/30/59" and a "last known address" of 107 Interlude, New Iberia, Louisiana, had previously been convicted of Predicate #1. In support of its proof concerning Predicate #1, the state introduced (1) a transcript of the February 16, 1993 guilty plea of Clarence Dudley, date of birth 12/30/59, under Tangipahoa Parish Docket #s 63,857 and 64,439; (2) a minute entry of the February 16, 1993 guilty plea of Clarence Dudley, date of birth 12/30/59, under Tangipahoa Parish Docket #s 63,857 and 64,439; (3) original fingerprint cards for arrest dates of 10/27/05 and 9/4/02 for Clarence Dudley, black male, date of birth 12/30/59, 107 Interlude, New Iberia, Louisiana, Social Security number XXX-XX-XXXX; and (4) a copy of a fingerprint card dated 7/12/93 for Clarence Dudley, black male, Social Security number XXX-XX-XXXX. The transcript showed that Clarence Dudley, date of birth 12/30/59, represented by counsel, after being advised of his Boykin[14] rights, pleaded guilty to possession with intent to distribute cocaine and possession of cocaine. The minute entry also reflected that Clarence Dudley, date of birth 12/30/59, represented by counsel, pleaded guilty to possession with intent to distribute cocaine and possession of cocaine.
Additionally, the state presented testimony from Louisiana State Police Criminal Records Analyst Kathy Williams. Williams testified that her job involved maintaining and updating criminal records history and verifying new fingerprints with fingerprints already in the criminal records database. The trial court accepted Williams as an expert in the identification *29 and analysis of rolled fingerprints. Williams testified that she had examined fingerprints purportedly belonging to Clarence Dudley taken in connection with Predicate #1, fingerprints taken from Clarence Dudley in connection with his arrest on count XII, and fingerprints taken from Clarence Dudley in open court. Based upon ten points of identification, she concluded that the fingerprints all belonged to the same person. Williams confirmed that the fingerprints taken in connection with Predicate #1 were contained on an original fingerprint card sent to her by the Department of Corrections, Amite District, the agency that had fingerprinted defendant in connection with Predicate #1.
The defense argued that the bill of information for Predicate #1 did not contain any fingerprints and that there was insufficient proof that defendant was the same "Clarence Dudley" involved in Predicate #1. The trial court rejected the defense's argument, and adjudged defendant a second-felony habitual offender with regard to count XII. The trial court noted that the matching of defendant's known fingerprints to the fingerprints obtained in connection with Predicate #1 established that the Predicate #1 fingerprints did indeed belong to defendant. We find no error with regard to the habitual-offender adjudication. Even in the absence of fingerprints on the Predicate #1 bill of information, the State presented other competent evidence to identify defendant as the same person convicted of Predicate #1.
Article I, section 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Hurst, 99-2868, pp. 10-11 (La.App. 1st Cir. 10/3/00), 797 So.2d 75, 83, writ denied, 00-3053 (La.10/5/01), 798 So.2d 962.
In State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993), the Louisiana Supreme Court recognized that if a trial judge determines that the punishment mandated by the Habitual-Offender Act makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," he is duty-bound to reduce the sentence to one that would not be constitutionally excessive.
However, the holding in Dorthey was made only after, and in light of, the court's express recognition that, "the determination and definition of acts which are punishable as crimes is purely a legislative function." The court recognized that "[i]t is the Legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies" and that "courts are charged with applying these punishments unless they are found to be unconstitutional." Dorthey, 623 So.2d at 1278. (Citations omitted).
In State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, the Supreme Court re-examined the issue of when Dorthey permits a downward departure from the mandatory *30 minimum sentences in the Habitual-Offender Act. The court held that to rebut the presumption that the mandatory minimum sentence was constitutional, the defendant had to "clearly and convincingly" show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
Johnson, 97-1906 at p. 8, 709 So.2d at 676.
Whoever violates the provisions of La. R.S. 14:230, if the value of the funds is one hundred thousand dollars or more, shall be imprisoned at hard labor for not less than five years nor more than ninety-nine years and may be fined fifty-thousand dollars. La. R.S. 14:230(E)(4).
Louisiana Revised Statutes 15:529.1, in pertinent part, provides:
A. (1) Any person who, after having been convicted within this state of a felony . . . thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
(a) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction[.]
As a second-felony habitual offender on count XII, defendant was sentenced to fifty years at hard labor. The record shows that the trial court ordered and reviewed a pre-sentence investigation (PSI) in this case prior to imposing sentence. The PSI report concluded: "Given the scope and the extent of this criminal investigation and prosecution, and in view of the fact that the subject and his codefendant express no remorse and admit no guilt, our office is of the opinion that a period of incarceration and a DOC sentence commensurate with the serious nature of these offenses is in order."
In the instant case, defendant failed to clearly and convincingly show that because of unusual circumstances he was a victim of the legislature's failure to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. Accordingly, there was no reason for the trial court to deviate from the provisions of La. R.S. 15:529.1(A)(1)(a) in sentencing defendant. Based upon our review of the record, the sentence imposed was certainly not grossly disproportionate to the severity of the offense and, thus, was not unconstitutionally excessive.
This assignment of error is without merit.

PRO SE ASSIGNMENTS OF ERROR
In his pro se brief, defendant raises two new issues. Initially, he attacks the habitual-offender adjudication as violative of the rule of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because a jury did not decide whether or not Predicate #1 was a felony. Secondly, he challenges the legality of the search of Westend.
A thorough review of the record indicates that neither the Apprendi issue nor the suppression issue was preserved for appeal. Defendant failed to argue the *31 Apprendi issue before the trial court, and although he filed a pro se motion to suppress, his counsel never adopted the motion. An irregularity or error cannot be availed of after verdict unless, at the time the ruling or order of the court was made or sought, the party made known to the court the action which he desired the court to take, or of his objections to the action of the court, and the grounds therefor. La. C.Cr.P. art. 841; La.C.Cr.P. art. 703(F); La. C.E. art. 103(A)(1).
CONVICTIONS AND SENTENCES ON COUNTS II  X AFFIRMED; CONVICTION AND SENTENCE ON COUNT XI VACATED; CONVICTION, HABITUAL-OFFENDER ADJUDICATION, AND SENTENCE ON COUNT XII AFFIRMED.
NOTES
[1] On February 16, 2007, the appeal of the codefendant, Jacklin Gerac Dudley, was dismissed due to her death.
[2] Defendant also filed a pro se brief, supplementing the arguments raised in his counseled brief.
[3] Westend's provider enrollment documents listed Gabriel Ikechukwu as its medical director.
[4] Records submitted to DHH from Westend indicated that April Babin was the Denver II certified person at Westend from February 1, 2001, until Jacklin Dudley became Denver II certified on March 17, 2001.
[5] Unisys issued checks for payment of Medicaid claims billed to DHH in Baton Rouge.
[6] See n. 8, infra.
[7] Wanda Jones allegedly assisted Jacklin Dudley on two of the alleged service dates.
[8] The KIDMED Provider Manual, § IV (The Screening Periodicity Schedule), provided:

You have a responsibility for coordinating medical, vision, and hearing screenings. If a child is linked to you for medical, vision and hearing screenings, you must complete the vision and hearing screening on the same day that the medical screening is performed. This is to be done on the same day to prevent the child from having to return at a later date.
Section V (Conducting the Medical Screening) of the Manual also provided, "All components [of the medical screening] including specimen collection, must be provided onsite during the same medical screening visit." (Emphasis supplied.) Finally, Section VIII (Providing or Referring for Diagnosis and Initial Treatment) provided:
Medical, vision, or hearing screening findings may indicate the need for counseling, consultation, or other intervention by ancillary personnel, including registered nurses, certified physician assistants, licensed social workers, and registered dieticians, beyond the basic health education and anticipatory guidance components of the medical screening. These findings may involve a medical, developmental, mental health, or substance abuse problem or condition found in a screening or an ongoing problem or condition. These additional services must be provided in a face-to-face setting with the child, parents, or guardians. They may also be provided face-to-face with another professional in a school setting. (Emphasis supplied.)
[9] At trial, the prosecutor mistakenly referred to the Medicaid recipient listed in count VII as "Jodd Mason."
[10] Five of the service dates bore no entry as to which nurse had provided those services.
[11] Jacklin Dudley testified that "we" were contacted by DHH, and that DHH stated that it would not give "us" a provider number unless "we" talked to "Joe Kopsa."
[12] The Blockburger test is as follows:

The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
Blockburger, 284 U.S. at 304, 52 S.Ct. at 182.
[13] Our resolution of defendant's first assignment of error, vacating defendant's conviction for theft over $1,000 (count XI), renders unnecessary any consideration of the sufficiency of the evidence supporting the vacated conviction.
[14] Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).